IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SEGUNDO BART ESCOBAR, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| FRIO COUNTY, JAIL DIVISION FRIO | § | |
| COUNTY SHERIFF'S OFFICE,  FRIO | § | |
| COUNTY SHERIFF'S OFFICE, LIONEL | § | |
| TREVINO, SHERIFF (FORMER), IN HIS | § | CIVIL NO. |
| INDIVIDUAL & OFFICIAL CAPACITY; | § | SA-17-CV-0392-DAE |
| ALBERTO DE LEON, SHERIFF | § | |
| (CURRENT) IN HIS OFFICIAL | § | |
| CAPACITY; WESLEY WOLFE, JAIL | § | |
| ADMINISTRATOR, IN HIS | § | |
| INDIVIDUAL & OFFICIAL CAPACITY; | § | |
| E. GARZA, COUNTY JAILER, IN HIS | § | |
| INDIVIDUAL & OFFICIAL CAPACITY; | § | |
| DEPUTY FNU AROCHA, DEPUTY | § | |
| SHERIFF, IN HIS INDIVIDUAL & | § | |
| OFFICIAL CAPACITY; AND | § | |
| ESCOLASTICA WOLFE, COUNTY | § | |
| JAILER, IN HER INDIVIDUAL & | § | |
| OFFICIAL CAPACITY; | § | |
| | § | |
| *Defendants.* | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge David A. Ezra:**

This Report and Recommendation concerns Defendant Frio County and Sheriff Lionel Trevino's Motion for Summary Judgment [#60] and Defendant Frio County Jailers Wesley Wolfe, Escolastica Wolfe, Eulalio Garza, and Deputy Arocha's Motion for Summary Judgment [#61].  This case was referred to the undersigned for the disposition of all non-dispositive pretrial matters pursuant to this Court's Standing Order regarding cases filed by prisoners asserting claims under 42 U.S.C § 1983.  The District Court thereafter referred Defendants' motions for summary judgment, both of which are dispositive motions, for a report and recommendation.

1

Therefore, the undersigned has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is recommended that Defendants' motions be granted in part and denied in part as follows.

## I. Procedural Background

This civil rights action arises out of the alleged rape of Plaintiff Segundo "Bart" Escobar while he was being detained in the Frio County Jail/Holding Facility. Plaintiff originally filed this action in the Del Rio Division of the Western District of Texas on May 2, 2017, pursuant to 42 U.S.C. § 1983, alleging the County of Frio, the Frio County Sheriff's Office, and various individual sheriffs and jail administrators deliberately failed to protect him from the rape and denied him post-rape medical treatment.[1] (Compl. [#1] at 4–12.) The Del Rio Division ordered the case transferred to this division on May 3, 2017 [#3], and this Court granted Escobar's motion to proceed in forma pauperis in this action [#5] and ultimately appointed Escobar counsel [#27].

Escobar filed a First Amended Complaint on September 11, 2018 [#53] against Defendants the County of Frio, Frio County Sheriff's Office, and the following individuals in their individual and official capacities: Former Sheriff Lionel Trevino, Jail Administrator Wesley Wolfe, County Jailer Escolastica Wolfe, County Jailer Eulalio Garza, III, and Deputy Sheriff Alfredo G. Arocha, III. Escobar's First Amended Complaint alleges violations of the Eighth Amendment and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against all Defendants for failure to protect him from sexual assault, for failure to provide him with medical care or to investigate his report of sexual assault, and for failure to protect him from self-harm.

---

[1] Escobar also originally named as Defendants Live Oak County and the Live Oak County Sheriff's Office and officials from this office, but he moved to voluntarily dismiss these Defendants prior to the order of service in this case [#6].

(*Id.* at ¶¶ 43–56.)  Escobar also alleges that the individual Defendants—Defendants Trevino, W. Wolfe, E. Wolfe, Garza, and Arocha—owed him a duty to keep him safe from sexual assault and to provide proper medical and mental health treatment and that their breach of these duties constituted negligence and gross negligence in violation of Texas law.  (*Id.* at ¶¶ 57–64.)

All Defendants have moved for summary judgment [#60, #61].  Escobar filed a response to the motions [#62], and Defendants filed a joint reply [#63].  The motions are ripe for this Court's review.

## II.  Summary Judgment Record

The following facts are undisputed, unless otherwise noted.  This case concerns events that occurred at the Frio County Jail/Holding Facility between May and June 2015.  At the time of the events at issue, Defendant Trevino was the Sheriff of Frio County; Defendant Arocha was a Deputy with the Frio County Sheriff's Department; Defendant W. Wolfe was the jail administrator of the Frio County Jail; Defendant E. Wolfe, the mother of W. Wolfe, was one of the jailers and also in charge of the jail kitchen; and Defendant Garza was an additional jailer. (W. Wolfe Dep. [#60-3] at 21:21–22:1, 28:23–25; Trevino Dep. [#60-2] at 36:18–21, 49:22–50:13; Garza Dep. [#60-5] at 11:4–8, 82:19–20.)  Escobar was a frequent detainee at the Frio County Jail and had been detained there somewhere between eight and twelve times prior to the incidents underlying this suit.  (Trevino Dep. [#60-2] at 78:14–18; W. Wolfe Dep. [#60-3] at 54:10–11; E. Wolfe Dep. [#60-4] at 41:1–3; Escobar Dep. [#60-6] at 59:20–23; Def.'s Am. Answer [#55] at 3.)

Escobar identifies as a homosexual and has struggled with substance abuse and addiction, as well as mental health issues, for years.  Escobar testified in his deposition that he has been diagnosed at various times with PTSD, bipolar disorder, and schizophrenia.  (Escobar Dep. [#60-

6] at 130:17–24.) At the time of the detentions at issue in this suit, many of the Defendants already knew Escobar well. W. Wolfe was Escobar's ex-brother-in-law, as W. Wolfe was previously married to Escobar's sister. (W. Wolfe Dep. [#60-3] at 45:21–23.) When Escobar was a teenager, W. Wolfe and his ex-wife had attempted to obtain custody of Escobar but were unsuccessful. (W. Wolfe Dep. [#60-3] at 49:14–50:14; Escobar Dep. [#60-6] at 10:18–11:1.) Escobar had stayed with W. Wolfe and his ex-wife, on and off for five years, including a continuous one-year period before Escobar began having problems with addiction and substance abuse. (W. Wolfe Dep. [#60-3] at 51:2–52:7; Escobar Dep. [#60-6] at 13:8–10.) W. Wolfe was familiar enough with Escobar's problems to know that Escobar had become addicted to heroin when he was a teenager and that Escobar had ongoing issues with drug use. (W. Wolfe Dep. [#60-3] at 54:12–14; Escobar Dep. [#60-6] at 78:1–5.) W. Wolfe also knew that Escobar had a history of mental health issues because the Frio County Jail had called the Department of Mental Health and Mental Retardation ("MHMR") numerous times to evaluate Escobar during his various detentions. (W. Wolfe Dep. [#60-3] at 142:12–143:1.) Sheriff Trevino testified in his deposition that the jail staff at Frio County Jail were generally aware that Escobar had mental health problems. (Trevino Dep. [#60-2] at 77:13–20.)

On May 7, 2015, Escobar was arrested and arrived at the Frio County Jail to be detained. (Garza Dep. [#60-5] at 53:6–54:25; Observation Log [#60-1] at 2.) Garza was working at the time Escobar arrived and was responsible for Escobar's initial screening and booking. (Garza Dep. [#60-5] at 53:6–54:25, 56:2–57:25; Observation Log [#60-1] at 2.) Escobar was exhibiting withdrawal symptoms from heroin at the time of his arrival, but he self-reported as being neither depressed nor suicidal. (Screening Form [#62-9] at 1.) Escobar maintains that he informed Garza of his homosexuality sometime during the booking process and believes the other jailers

were also aware of his sexual orientation. (Escobar Resp. to Rogs. [#62-1] at 7.) Sheriff Trevino also testified that he and the other jailers at Frio County Jail were aware of Escobar's sexual orientation, yet Garza claims he did not have such knowledge. (Garza Dep. [#60-5] at 160:17–18; Trevino Dep. [#60-2] at 79:14–21.)

Sometime between May 7, 2015 and May 10, 2015, Escobar was placed in "O Tank," one of the sections of the jail that houses eight men. (Garza Dep. [#60-5] at 21:7–25, 22:14–17, 29:16–19.) "O Tank" is the only section of the jail that does not have cameras due to its close proximity to the control center at the front of the jail. (Garza Dep. [#60-5] at 34:23–35:12.) On May 10, 2016, Garza clocked in for work around 2:00 p.m.; at this time, Escobar and one other inmate, a Mexican American who did not speak any English, were in "O Tank" in the tank's common break room. (Garza Dep. [#60-5] at 63:7–20, 70:22–71:24.) Escobar claims no one checked on him during the entire afternoon until they served him supper, yet an observation log documents the completion of the required 30-minute checks on every inmate and all tanks, including the holding and detox cells during this same time period. (Garza Dep. [#60-5] at 24:5–25:8; Observation Log [#60-1] at 6, 9; Escobar Dep. [#60-6] at 76:13–15.)

At approximately 5:00 p.m., Escobar began asking through the jail's PA system to make a phone call to his mom and to Emergency Medical Services ("EMS"), but Escobar was either not permitted to make any more calls that day or had been barred from making calls from the jail altogether, so Garza did not respond. (Garza Dep. [#60-5] at 68:9–24; Escobar Dep. [#60-6] at 61:10–62:6; Observation Log [#60-1] at 4.) Escobar then asked through the PA system to talk to Garza face to face because Escobar did not want to speak with Garza in front of the other inmate in the cell. (Garza Dep. [#60-5] at 69:2–19.) When he ultimately spoke with Garza, Escobar

informed Garza that the other inmate in "O Tank" had raped him. (Garza Dep. [#60-5] at 69:20–25.) Defendants vigorously dispute Escobar's claim that a rape occurred.

According to Escobar, he was asleep on his mattress on the floor of the break area and woke up with the other inmate's penis in his anus. (Garza Dep. [#60-5] at 74:21–75:13.) Escobar claims there was blood smeared on his hands, on the back of his uniform, on his boxers, on the mattress, and on the floor. (Escobar Dep. [#60-6] at 66:12–67:9.) When Garza came to the tank, Escobar held up a pair of underwear with a stain on it for Garza as proof of the assault. (Garza Dep. [#60-5] at 79:11–21; Escobar Dep. [#60-6] at 86:20–25.) According to Garza, the stain looked old and dry and he suspected it was not blood from the alleged assault because Escobar was wearing his orange jail uniform, was acting calm, and did not appear to be injured. (Garza Dep. [#60-5] at 79:11–21, 94:22–24.) According to Garza, Escobar "was perfectly fine. He wasn't distraught or in fear or hurt. He wasn't bleeding from anywhere." (Garza Dep. [#60-5] at 169:21–23.)

The other inmate was removed from "O Tank," and Garza called Deputy Arocha in dispatch and E. Wolfe, who was also working a shift as a jailer at the time. (Garza Dep. [#60-5] at 80:11–82:18, 91:6–18; Escobar Dep. [#60-6] at 66:13–20, 87:1–88:8, 88:21–25.) Deputy Arocha arrived at the jail to talk with Escobar, and Escobar also told Arocha he had been raped. (Escobar Dep. [#60-6] at 66:19–22.) Escobar testified that he showed the blood stains to Arocha, Garza, and E. Wolfe. (Escobar Dep. [#60-6] at 65:19–25, 70:19–20.) Garza claims he did not see blood anywhere in the cell. (Garza Dep. [#60-5] at 169:24–170:4.) E. Wolfe also testified that Escobar did not appear to have anything wrong with him and she believed he had not been assaulted. (E. Wolfe Dep. [#60-4] at 60:2–13.) Escobar testified in his deposition that he asked to be taken him to the hospital to get checked for sexually transmitted diseases but his request

was dismissed.  (Escobar Dep. [#60-6] at 65:19–25.)  There is no incident report about the rape and no one called EMS or took Escobar to the hospital for an examination.  (Trevino Dep. [#60-2] at 68:9–24, 69:9–19.)

Soon thereafter, around 6:30 p.m., Escobar again called for Garza on the PA system, this time saying he had cut himself, was bleeding, and wanted to go to the hospital.  (Garza Dep. [#60-5] at 99:21–100:19; Escobar Dep. [#60-6] at 96:2–9; Observation Log [#60-1] at 5.)  According to Escobar, he was so angry and distraught that the officers failed to adequately respond to the reported assault that he cut his wrist three times with a broken jail-issued razor that had been left in his cell.  (Escobar Dep. [#60-6] at 91:21–92:22.)  Both Garza and E. Wolfe testified that all that was visible on Escobar's arm were small little scratches that looked like a cat scratch and Escobar was not in distress.  (Garza Dep. [#60-5] at 100:20–101:2; 102:17–20,103:22–25, 110:5–10.)  Again, Defendants vigorously dispute Escobar's rendition of the facts surrounding this cutting or Escobar's characterization of it as an attempted suicide.

Nonetheless, Garza removed Escobar from "O Tank" and placed him in the restraining chair at the front of the jail, where E. Wolfe cleaned and bandaged the cuts, changed Escobar into the green suicide gown, and placed him in the detox cell where there was a camera for monitoring.  (Garza Dep. [#60-5] at 101:3–14; Escobar Dep. [#60-6] at 95:2–12, 96:19–97:13; Escobar Dep. [#60-6] at 97:17–98:3; Observation Log [#60-1] at 5.)  Escobar was not taken to the hospital for a mental health evaluation or other treatment and was released soon thereafter from the jail.  (Frio County Resp. to RFP [#62-7] at 4; Escobar Dep. [#60-6] at 99:1–9; Trevino Dep. [#60-2] at 73:3–5.)

A few weeks later, on June 2, 2015, Escobar was again arrested and taken to the Frio County Jail for detention.  (Trevino Dep. [#60-2] at 73:6–8; Escobar Dep. [#60-6] at 102:11–92.)

Escobar claims he was again detoxing from heroin when he was admitted. (Escobar Dep. [#60-6] at 105:17–19.) A few days after Escobar was booked at the jail, on June 7, 2015, he attempted suicide or self-harm by swallowing shards of broken glass from a broken coffee container. (Escobar Dep. [#60-6] at 105:20–24; Observation Log [#60-1] at 23.) At this time, there was an inmate-by-inmate policy that allowed family members to bring commissary items to inmates, such as toiletries and snacks. (Trevino Dep. [#60-2] at 73:18–74:3; W. Wolfe Dep. [#60-3] at 81:4–19.) It was the responsibility of the jailers on staff to inspect the items before giving them to inmates. (Trevino Dep. [#60-2] at 74:12–24.) Although glass of any kind is not permitted in the jail, someone failed to notice the coffee container upon inspection. (Trevino Dep. [#60-2] at 76:18–20.) Escobar intentionally shattered the container and swallowed several quarter-size pieces of glass. (Trevino Dep. [#60-2] at 76:21–10; E. Wolfe Dep. [#60-4] at 126:17–127:2; Escobar Dep. [#60-6] at 107:9–17, 114:5–22.) Escobar testified that he was angry because the jail had not responded to his rape charge and had not taken his previous suicide attempt seriously. (Escobar Dep. [#60-6] at 119:22–120:21.)

E. Wolfe called EMS, and Escobar was taken to the nearest emergency room at Frio Regional Hospital, where he was x-rayed and the glass shards were identified, and then transferred to Methodist Hospital for eight days of treatment. (E. Wolfe Dep. [#60-4] at 130:5–15; Trevino Dep. [#60-2] at 77:9–78:3; Discharge Report [#62-10] at 1; Escobar Dep. [#60-6] at 123:14–124:9.) Escobar returned to the Frio County Jail upon his release from the hospital on June 15, 2015. (Escobar Dep. [#60-6] at 136:1–140:23; Observation Log [#60-1] at 30.) MHMR was never called to evaluate Escobar before, during, or upon his release from the hospital. (Trevino Dep. [#60-2] at 78:7–9.) The day after Escobar returned to the jail, he told

jailers he was going to bite himself, was placed on suicide watch, and MHMR was called to visit with Escobar.  (Observation Log [#60-1] at 30.)

### III.  Legal Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial.  *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence.  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The Court will view the summary judgment evidence in the light most favorable to the non-movant.  *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## IV. Analysis

Defendants Frio County, Frio County Sheriff's Office, and Sheriff Lionel Trevino (the former Sheriff of Frio County) move for summary judgment [#60], arguing that (1) Escobar has failed to show a custom or policy of deliberate indifference that could subject Frio County to liability under 42 U.S.C. § 1983; (2) Defendant Frio County Sheriff's Department lacks jural existence as a matter of law to be subject to suit under Section 1983; (3) Defendant Trevino is entitled to qualified immunity as to Plaintiff's Section 1983 claims; and (4) Escobar's negligence claims against Sheriff Trevino fail as a matter of law under the Texas Tort Claims Act's election-of-remedies doctrine. Defendants W. Wolfe, E. Wolfe, Garza, and Arocha also move for summary judgment [#61], arguing they are also entitled to qualified immunity for the claims asserted against them in their individual capacities and Escobar's negligence claims fail as a matter of law under the election-of-remedies doctrine.

Escobar filed a single response to the arguments raised in both of the motions [#62]. The response does not address the argument that Defendant Frio County Sheriff's Office lacks jural existence or that Escobar's negligence claims fail as a matter of law under the Texas Tort Claims Act's election-of-remedies doctrine, focusing instead on the municipal liability and qualified immunity arguments as to Escobar's Section 1983 claims. After considering the arguments raised, Escobar's response or lack of response thereto, and the summary judgment record before the Court, the undersigned concludes that (1) the Frio County Sheriff's Department is entitled to summary judgment because the Department has no legal capacity to be sued separately from Frio County; (2) the individual Defendants are entitled to summary judgment on Escobar's claims of negligence and gross negligence because these claims are barred by the Texas Tort Claims Act's election-of-remedies doctrine; (3) all of the individual Defendants are entitled to qualified

immunity as to Escobar's Section 1983 claim based on a failure to protect him from sexual assault; (4) none of the individual Defendants are entitled to qualified immunity as to Escobar's Section 1983 claim based on a denial of adequate medical care in response to his report of a sexual assault; and (5) Frio County is not entitled to summary judgment on Escobar's Section 1983 municipal liability claim.

A.      **Escobar's Section 1983 claims against Defendant Frio County Sheriff's Department fail as a matter of law because there is no evidence the Department is a jural entity.**

Defendant Frio County seeks summary judgment on Escobar's claims against the Frio County Sheriff's Department on the basis that this department lacks separate jural existence from Frio County and therefore is not a proper Defendant in this action.  Indeed, Defendant Frio County Sheriff's Department is not a proper defendant and is entitled to summary judgment on all claims asserted against it in this lawsuit.

"[A] plaintiff may not bring a civil rights claim against a servient political agency or department unless such agency or department enjoys a separate and distinct legal existence." *Estate of Schroeder v. Gillespie Cty.*, 23 F. Supp. 3d 775, 781 (W.D. Tex. 2014) (citing *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1991)).  Accordingly, the Frio County Sheriff's Department, an agency of Frio County, cannot engage in litigation "unless the true political entity has taken explicit steps to grant the servient agency with jural authority."  *See Darby*, 939 F.2d at 313–14 (internal citations omitted).

Escobar did not address this argument in his response to Defendants' motions for summary judgment.  Nor did he submit any evidence regarding the legal status of the Frio Sheriff's Department.  Accordingly, there is no basis for the Court to determine whether the Frio County Sheriff's Department has a legal existence separate from Frio County for purposes of litigation.  Escobar bears the burden of proof on this issue.  *Cf. id.* at 314 (reviewing charter to

determine that city did not authorize suit against its police department). Because Escobar has failed to come forth with any evidence to show that Frio County ever granted the Sheriff's Department the capacity to engage in litigation, the Sheriff's Department should be awarded summary judgment on all claims asserted against it in this lawsuit. *See id.*; *Estate of Schroeder*, 23 F. Supp. 3d at 781.

**B.** **The Court should grant the Individual Defendants' motion for summary judgment on Escobar's negligence and gross negligence claims.**

Escobar asserts claims of negligence and gross negligence against all the individual Defendants. Sheriff Trevino and Frio County Jailers W. Wolfe, E. Wolfe, Garza, and Deputy Arocha move for summary judgment on these claims under the Texas Tort Claims Act's ("TTCA") election-of-remedies doctrine. *See* Tex. Civ. Prac. & Rem. Code § 101.106. Escobar does not respond to this argument, and the Court agrees that Escobar's claims of negligence and gross negligence fail as a matter of law.

The TTCA provides that "[t]he filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter." Tex. Civ. Prac. & Rem. Code § 101.106(a). "If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code § 101.106(e). Additionally, if a plaintiff's suit is "filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment" and "could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only." Tex. Civ. Prac. & Rem. Code § 101.106(f). The TTCA defines the term "scope of employment" as "the

performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority." *Id.* § 101.001(5).

In enacting subsections (e) and (f), the Texas Legislature "foreclose[d] suit [under the TTCA] against a government employee in his individual capacity if he was acting within the scope of employment." *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 357 (Tex. 2013) (quoting *Franka v. Velasquez*, 332 S.W.3d 367, 382 n.68 (Tex. 2011)). The election-of-remedies provision therefore "force[s] a plaintiff to decide at the outset whether an employee acted independently . . . or acted within the general scope of his or her employment." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008).

Because Escobar has not sued Frio County for negligence, and instead sues only the individual Defendants, only subsection 101.106(f) applies. *See Pyle v. City of Harlingen*, No. 1:13-147, 2014 WL 1230026, at *4 (S.D. Tex. Mar. 20, 2014). In order to trigger subsection 101.106(f), two conditions must be satisfied: (1) the alleged act or omission fell within the scope of the individual defendant's employment; and (2) suit could have been brought against the government under the TTCA. *Tipps v. McCraw*, 945 F. Supp. 2d 761, 767, 768 (W.D. Tex. 2013). The individual Defendants concede that they were acting within the course and scope of their employment during the events occurring at the Frio County Jail in this lawsuit. (Am. Answer [#55] at 3.) Escobar does not argue otherwise, as he has not responded to this section of Defendants' summary judgment motions.

As to the second prong of the Court's inquiry, the Texas Supreme Court has explained that a tort claim "could have been brought" under the TTCA even if the Act does not specifically

waive immunity from suit as to the particular claim at issue.[2]  *Franka*, 332 S.W.3d at 375. "Properly construed, section 101.106(f)'s two conditions are met in almost every negligence suit against a government employee:  he acted within the general scope of his employment and suit could have been brought under the Act—that is, his claim is in tort and not under another statute that independently waives immunity."  *Id.* at 381.  "In such cases, the suit 'is considered to be against the employee in the employee's official capacity only,' and the plaintiff must promptly dismiss the employee and sue the government instead."  *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 101.106(f)).  Accordingly, the Court should award the individual Defendants summary judgment on Escobar's negligence and gross negligence claims under the election-of-remedies provision in the TTCA.

**C.**  **Defendants are entitled to summary judgment on Escobar's Section 1983 Claims based on Defendants' alleged failure to protect him from harm, but his inadequate medical care claims should proceed to trial.**

Escobar alleges violations of his Eighth Amendment right to protection against cruel and unusual punishment based on the alleged sexual assault by another inmate and his Fourteenth Amendment right to adequate medical care and protection from self-harm based on Defendants' response to his allegations of assault and his two attempted suicides.  (Am. Compl. [#53] at ¶¶ 44–59.)  Escobar brings his Section 1983 claims against all Defendants.  (*Id.*)

A plaintiff can establish a claim under Section 1983 for the deprivation of civil rights by establishing: (1) a violation of a federal constitutional or statutory right; and (2) that the violation

---

[2] "In order for immunity to be waived under the TTCA, the claim must arise under one of the three specific areas of liability for which immunity is waived, and the claim must not fall under one of the exceptions from waiver."  *Medrano v. City of Pearsall*, 989 S.W.2d 141, 143–44 (Tex. App.—San Antonio 1999, no pet.).  The three specific areas of liability for which immunity has been waived are: (1) injury caused by an employee's use of a motor-driven vehicle; (2) injury caused by a condition or use of tangible personal or real property; and (3) claims arising from premise defects.  Tex. Civ. Prac. & Rem. Code § 101.021.

was committed by an individual acting under the color of state law. *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995). Pretrial detainees like Escobar enjoy the same rights as convicted prisoners to "constitutional essentials like medical care and safety," but those rights emanate from the Fourteenth Amendment's due process guarantees, not the Eighth Amendment. *Rogge v. City of Richmond, Tex.*, 995 F. Supp. 2d 657, 666 (S.D. Tex. 2014); *see also Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (stating that the procedural and substantive due process guarantees of the Fourteenth Amendment provide constitutional protections to pretrial detainees); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1995) (en banc) (same). The Court therefore construes all of Escobar's Section 1983 claims under the Fourteenth Amendment. A "deliberate indifference" standard governs all such claims, regardless of whether they concern a deprivation of "basic human needs, including medical care" or "protection from harm" during confinement. *Rogge*, 995 F. Supp. 2d at 666.

Fourteenth Amendment challenges by pretrial detainees under Section 1983, as here, are classified as either an attack on a "condition of confinement" or an "episodic act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). A "condition of confinement" case is a constitutional attack on "general conditions, practices, rules, or restrictions of pretrial confinement." *Id.* (quoting *Hare*, 74 F.3d at 644). In such cases, a constitutional violation exists only if we then find that the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective. *See Hare*, 74 F.3d at 640.

In contrast, where the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an "episodic act or omission" case. *Scott*, 114 F.3d at 53. "In an 'episodic act or omission' case, an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or

omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Id.*

Defendants characterize this case as an "episodic act or omission" case, and Escobar does not argue otherwise, as the alleged violations concern the response of specific Frio County Jail officials to Escobar's alleged sexual assault and two attempted suicides. In an episodic act or omission case, this Court employs different standards to claims against the individual versus municipal Defendants. *See Olabisiomotosho*, 185 F.3d at 526.

With respect to the individual Defendants, Escobar "must establish that the official(s) acted with subjective deliberate indifference to prove a violation of his constitutional rights." *Flores v. County of Hardeman*, 124 F.3d 736, 738–39 (5th Cir. 1997) (affirming summary judgment as to an individual defendant because there was no genuine issue of material fact indicating that he acted with deliberate indifference)). Subjective deliberate indifference means "the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Hare*, 74 F.3d at 650. To succeed in holding a municipality liable for his alleged injuries, Escobar must demonstrate both (1) a municipal employee's subjective deliberate indifference and (2) that the municipal employee's act "resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [Escobar]'s constitutional rights." *See id.* at 649 n.4.

The individual Defendants move for summary judgment on Escobar's Section 1983 claims based on the defense of qualified immunity. Frio County moves for summary judgment on Escobar's Section 1983 claims arguing that Escobar has failed to identify a policy or custom of the County causing his injuries. The Court addresses each of these arguments in turn.

i.      Liability of Individual Defendants

Sheriff Trevino, Deputy Arocha, and Jailers W. Wolfe, E. Wolfe, and Garza all move for summary judgment on Escobar's individual-capacity Section 1983 claims based on their affirmative defense of qualified immunity. Qualified immunity shields federal and state officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The qualified immunity analysis is based on all the evidence before the Court, and not just the pleadings. *See Mace v. City of Palestine*, 333 F.3d 621, 624 n.7 (5th Cir. 2003). In a qualified immunity determination, the facts are construed in the light most favorable to the party asserting the injury. *Austin v. Johnson*, 328 F.3d 204, 207 (5th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A right is clearly established for purposes of the second step of the qualified-immunity analysis if it would be clear to a reasonable official, at the time of the challenged conduct, that his or her conduct violated the statutory or constitutional right at issue. *Saucier*, 533 U.S. at 206. Stated another way, a right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Supreme Court has repeatedly admonished lower courts not to define clearly established law at a high level of generality. *See, e.g.*, *al-Kidd*, 563 U.S. at 742. Rather, the inquiry must be undertaken in light of the specific factual context of the case. *Mullenix v. Luna*, --U.S.--, 136 S. Ct. 305, 308 (2015). The dispositive question is "whether the violative nature of particular conduct is clearly established." *Al-Kidd*, 563 U.S. at 742. Lower courts have

discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The assertion of qualified immunity "alters the usual summary judgment burden of proof." *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (internal quotation omitted). The Court must draw all inferences in favor of the plaintiff, but once a state official asserts the defense, the burden shifts to the plaintiff to show that the defense is not available. *Id.* The Court will address each of Escobar's claimed constitutional violations and, as necessary, each individual Defendant's assertion of qualified immunity.

<b>(a)     Failure to Protect from Sexual Assault</b>

Escobar alleges that the individual Defendants violated his clearly established constitutional rights by failing to protect him from sexual assault. Escobar argues that Defendants knew he was a homosexual and therefore vulnerable to sexual assault by other inmates, yet Officer Garza placed him in the general population of the jail after booking on May 7, 2015. As a result, Escobar claims he was raped by a fellow detainee.

The Eighth Amendment affords prisoners protection against injury at the hands of other inmates. *Smith v. Wade*, 461 U.S. 30 (1983); *Johnston v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986). And this right is enjoyed by pretrial detainees like Escobar pursuant to the Fourteenth Amendment's due process guarantees. *See Rogge*, 995 F. Supp. 2d at 666. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prison official, however, may avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Escobar has not established that a clearly established constitutional violation occurred at the hands of Garza or any of the individual Defendants regarding his placement in the general population of the Frio County Jail. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al–Kidd*, 563 U.S. at 741.

Escobar has failed to direct the Court to any existing precedent that clearly establishes that Defendants' failure to consider his homosexuality in their placement of Escobar in "O Tank" with access to another inmate—without more—was a violation of his general Fourteenth Amendment right to be safe and protected from sexual assault in jail or in prison. *Cf. Farmer*, 511 U.S. at 832–34 (recognizing clearly established right to reasonable protection from sexual assault).

The only case Escobar relies on to defeat Defendants' qualified-immunity defense is a case in which the trial court denied qualified immunity to a correctional officer who both knew the plaintiff was homosexual and knew of specific threats of violence from the inmate who ultimately assaulted the plaintiff. *See Porter ex rel. Porter v. Cloy*, No. CIV. A. 02-3469, 2003 WL 22384930, at *4 (E.D. La. Oct. 15, 2003). In *Porter*, the plaintiff had specifically complained to the correctional officer that the inmate was threatening to beat him up and

sexually harassing him. *Id.* Instead of moving the plaintiff to a safer part of the jail, the correctional officer simply moved the plaintiff to the next cell, which remained open and accessible all day to the other inmate. *Id.* Based on these facts, the court concluded that a reasonable factfinder could find that the correctional officer had intentionally disregarded a known risk to serious harm in the form of sexual assault of the plaintiff. *Id.*; *see also Farmer*, 511 U.S. at 834. Importantly, the court did not rest its holding simply on the fact that the plaintiff was a homosexual.

Similarly, the Fifth Circuit affirmed a denial of qualified immunity in a case involving the repeated rape and abuse of a transgender inmate over a period of 18 months and the failure of prison officials to reasonably respond. *See Johnson v. Johnson*, 385 F.3d 503, 526–27 (5th Cir. 2004). Johnson not only had informed the classification committee upon his transfer to a new prison of his previous housing in "safekeeping" to protect him from aggression, but he was specifically told that he would not be protected, placed in general population where he was immediately raped, and made to be a sexual servant by various prison gangs for over a year. *Id.* at 512–13. Johnson sought help from guards, filed "life-endangerment" forms, wrote letters to prison administrators, and filed formal grievances with TDCJ, but his complaints were ignored or denied and he was told by officers to "get down there and fight" in general population. *Id.* at 513. On these facts, the Fifth Circuit affirmed the denial of qualified immunity, concluding that a complete failure to respond to Johnson's complaints of actual assault and abuse could not constitute "reasonable measures" to guarantee Johnson's safety, especially in light of the testimony of Johnson that the officers sent him back to general population to defend himself. *Id.* at 527 ("Although it is not clear exactly what type of action an official is legally required to take

under *Farmer*, the Supreme Court's opinion does make it abundantly clear that an official may not simply send the inmate into the general population to fight off attackers.").

Escobar's account of the facts in the case at hand is simply that Defendants knew he was homosexual; that Frio County and Garza admitted that homosexuals generally face more risk of sexual assault than heterosexual inmates; and that Garza or his supervisors did not direct Escobar's placement in separate housing. (*See* Def.'s Resp. to RFA [#62-7] at 3 (admission by Frio County of a well-known increased risk of sexual assault and inmate violence when housing homosexual inmates in the same cell as other inmates); Garza Dep. [#60-5] at 159:22–14 (acknowledging that homosexual inmates are generally housed separately to protect them from sexual violence).) Escobar has not provided any evidence that he previously suffered assault or received threats of assault in any previous detention or incarceration such that a failure of Garza or his supervisors to separate him from all other detainees would constitute a violation of clearly established law.

This evidence is insufficient to demonstrate that Officer Garza or any other individual Defendant violated Escobar's clearly established right to be protected from sexual assault. *See Escobedo v. Garza Cty. Sheriff's Dep't*, No. 5:16-CV-166-BQ, 2017 WL 6759136, at *4 (N.D. Tex. Oct. 23, 2017) (granting qualified immunity to correctional officer on a failure-to-protect claim based solely on allegations of an alleged failure to place the plaintiff in protective custody at his request). Although Garza acknowledged in his deposition that homosexual inmates are often housed separately to protect them from sexual violence, this evidence does not establish that a reasonable officer in Garza's position would have understood that Escobar faced an "excessive risk" of sexual assault in the Frio County Jail without knowledge of more than just his homosexuality. *See Mullenix*, 136 S. Ct. at 308 (2015).

Finally, the undersigned notes that Escobar's Amended Complaint includes allegations regarding a failure to protect Escobar from self-harm on two occasions that would fall under the same analysis as the failure to protect Escobar from sexual assault. Escobar alleges that Defendants failed to adequately search his cell so as to prevent him from cutting himself with a jail-issued razor and failed to adequately screen his commissary package so as to prevent him from obtaining and swallowing glass while detained. (Am. Compl. [#53] at ¶¶ 53–55.) Escobar does not address these allegations in his response to Defendants' invocation of the defense of qualified immunity, but regardless, the undersigned concludes that these allegations—even if proven—do not rise to the level of deliberate indifference so as to defeat Defendants' qualified immunity.

"Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'" *James v. Harris Cty.*, 577 F.3d 612, 617–18 (5th Cir. 2009) (quoting *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992)). There is no evidence that any Defendant intentionally left the razor in Escobar's cell or had an awareness that the commissary package contained a glass coffee container. Insofar as Escobar is pursuing any claim of a constitutional violation based on these allegations, these claims fail as a matter of law because there is not evidence that his constitutional rights were violated, or alternatively, Defendants are entitled to qualified immunity because the rights were not clearly established.

### (b)     Denial of Right to Medical Care

Escobar alleges that the individual Defendants violated his clearly established constitutional rights by failing to provide necessary medical care and a rape kit following the sexual assault and that this failed response led to his attempted suicide, the response to which

was also inadequate. Although the occurrence of the alleged assault is vigorously disputed by Defendants, it is undisputed that there is no incident report or other documentation regarding the assault and that no one provided Escobar with medical screening or a rape kit, called EMS, or sent Escobar to the hospital for medical treatment and testing for sexually transmitted diseases. (Trevino Dep. [#60-2] at 68:9–24, 69:9–19, 105:6–106:7 (testifying that there was no incident report or medical screening provided to Escobar after the alleged assault).) It is also undisputed that no one provided Escobar with a mental health evaluation or other treatment after the cutting of his wrist immediately following the alleged assault. (Frio County Resp. to RFP [#62-7] at 4; Escobar Dep. [#60-6] at 99:1–9; Trevino Dep. [#60-2] at 73:3–5.)

For purposes of evaluating Defendants' qualified immunity defense with respect to this alleged constitutional violation, however, the Court views the facts in the light most favorable to Escobar, *Anderson*, 477 U.S. at 255, meaning that the Court must assume that Escobar was indeed assaulted and that he showed Garcia, E. Wolfe, and Deputy Arocha blood and other evidence of his injuries. (Escobar Dep. [#60-6] at 65:19–25, 70:19–20.) "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255.

Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under Section 1983.

Although a jury may ultimately conclude that Escobar's testimony regarding the alleged rape and attempted suicide is not credible and find therefore that the response of Garza and E. Wolfe and Deputy Arocha was objectively reasonable under the circumstances, this issue may not be resolved on summary judgment by this Court. If the jury concludes that Escobar was assaulted and did show his bloody uniform, underwear, mattress, and hands to these officers, a reasonable factfinder could conclude that Garza, E. Wolfe, and Deputy Arocha denied Escobar medical care and that this denial constituted "deliberate indifference to [his] serious medical needs." *Id.* at 104. Similarly, if the jury concludes that Escobar attempted suicide by cutting his wrist with the razor, a reasonable jury could conclude that he was denied appropriate medical and mental health treatment. Viewing the facts in Escobar's favor, Garza, E. Wolfe, and Deputy Arocha—as the responding officers—and their supervisors—Sheriff Trevino and W. Wolfe—are not entitled to qualified immunity at this stage in the proceedings.

The Fifth Circuit has affirmed the denial of qualified immunity where a plaintiff informed an officer that he had been sexually assaulted and the officer nonetheless failed to follow Texas Department of Criminal Justice protocol for reported sexual assaults and did not administer any of the required procedures regarding sexual assault kits or medical and mental-health evaluations. *McCorvey v. Styles*, 607 Fed. App'x 375, 376–77 (5th Cir. 2015). In light of the officer's failure to take any action in response to the reported assault, the Fifth Circuit concluded that the officer's behavior was objectively unreasonable under clearly established law as well as under TDCJ policy. *See id.* The same result is compelled here.

The record, when viewed in the light most favorable to Escobar, establishes that Garza was the first to respond to Escobar's report of a rape, and that he called E. Wolfe and Deputy Arocha to assist with Escobar. (Garza Dep. [#60-5] at 80:11–82:18, 91:6–18; Escobar Dep.

[#60-6] at 66:13–20, 87:1–88:8, 88:21–25.)  Again, Escobar testified in his deposition that he showed the blood and other evidence of the assault to all three officers and yet they did nothing. (Escobar Dep. [#60-6] at 65:19–25, 70:19–20.)  None of these Defendants is entitled to qualified immunity at this stage in the proceedings.

The only other individual Defendants are Sheriff Trevino and W. Wolfe.  Neither was present at the time of the assault and therefore would only be liable for the denial of medical care based on their role as supervisors of the other individual Defendants.  Trevino and W. Wolfe, as supervisors, cannot be held individually liable under Section 1983 based solely on vicarious liability for the acts or omissions of the jailers and officials who had direct contact with Escobar. *See Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 534 (5th Cir. 1997).  Supervisory officials may be liable only if their own action or inaction, performed with a certain degree of gross negligence or deliberate indifference, proximately causes a constitutional violation. *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).  Accordingly, Escobar would have to show that: (1) the supervisory official either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of Escobar's rights; and (3) the failure to train or supervise amounts to deliberate indifference. *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998).

The summary judgment record raises a genuine dispute of material fact as to whether Sheriff Trevino and W. Wolfe, as jail administrator, failed to train the jailers in the proper response to assault and whether this lack of training both caused the lack of response and was deliberately indifferent to detainee's right to adequate care.

It is undisputed that Frio County had promulgated various policies under the "Frio County Detention Center Operational Plan" and that these policies were in place during the time

period relevant to this suit. (W. Wolfe Dep. [#60-3] at 87:16–20; Trevino Dep. [#60-2] at 88:9–95:10.) The Operational Plan included an emergency plan governing the proper response to a reported assault, which required a medical screening and documentation with still photographs of injuries before bandaging, as well as a plan to provide training to staff members for the involvement and handling of suicidal and mentally impaired offenders. (W. Wolfe Dep. [#60-3] at 95:12–97:25; Trevino Dep. [#60-2] at 95:1–15.) The suicide prevention plan required separation of any suicidal offender "with continuous attention until evaluated by a mental health professional" and documentation of all suicide attempts. (Trevino Dep. [#60-2] at 96:5–24.) Yet W. Wolfe, as jail administrator, testified that he had never seen or been given the policies while the County was running the jail (the jail had been previously run by a private company) and admitted that he did not know of any screening being performed on new detainees in terms of classification of inmates or documentation thereof. (W. Wolfe Dep. [#60-3] at 88:24–89:4, 98:7–18, 104:8–20.) Garza further testified that he was never given any written or oral policy on what to do in the event of a rape. (Garza Dep. [#60-5] at 89:11–90:6.) Nor had Garza received any training in how to respond to a medical emergency or to determine what constituted a medical event significant enough to call for support from EMS. (Garza Dep. [#60-5] at 114:7–115:19.)

Finally, expert witness Robert Dumond, a board certified and licensed clinical mental health counselor, has provided extensive opinions on Frio County Jail's failure to follow its own policies with respect to classification and separation of inmates, response to emergencies and assaults, provision of health services, and suicide prevention. (Dumond Expert Report [#62-8] at 58.) Frio County has not designated a rebuttal expert or filed a motion challenging Dumond's admissibility as an expert or the reliability of his opinions. Dumond opines that Frio County

26

failed to adequately respond to Escobar's reported assault in terms of evidence preservation, screening, and documentation; and failed to provide adequate medical care and mental health interventions following the alleged assault as well as the attempted suicide. (Dumond Expert Report [#62-8] at 58–79.)

This evidence, construed in the light most favorable to Escobar, is sufficient to raise a genuine issue of material fact as to whether Sheriff Trevino and W. Wolfe, in their supervisory capacities, failed to implement the County's policies or train jail staff regarding the appropriate response to a medical event such as an assault and whether this failure caused the lack of response to Escobar's report. A reasonable factfinder could conclude that these Defendants both had subjective knowledge that incidents of violence could occur in the jail yet they failed to take seriously this risk and to properly train jail staff on County policies.

ii.      Municipal Liability of Defendant Frio County[3]

Again, to succeed in holding a municipality liable for his alleged injuries, Escobar must demonstrate both (1) a municipal employee's subjective deliberate indifference and (2) that the municipal employee's act "resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [Escobar]'s constitutional rights." *See Hare*, 74 F.3d at 649 n.4. Frio County moves for summary judgment on Escobar's Section 1983 claims on the basis that Escobar has failed to identify any official policy or custom that was the moving force behind any alleged unconstitutional act and that the evidence does not demonstrate that Frio County officials acted with deliberate indifference or failed to take reasonable measure to protect

---

[3] Escobar sues the individual Frio County employees in their official and individual capacities under Section 1983. A claim against a municipal official in his or her official capacity is tantamount to a suit against the municipal entity and therefore considered redundant to the municipal-entity claim. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010).

Escobar from harm or provide for his medical needs. Escobar responds that the summary judgment evidence raises a genuine issue of material fact as to whether Frio County had a policy and practice of ignoring its own official policies regarding inmate safety and that the acts of the County demonstrate both subjective and objective deliberate indifference to Escobar's constitutional right to safety. The undersigned agrees with Escobar.

The evidence regarding Frio County's promulgation of various policies under the "Frio County Detention Center Operational Plan" that formed the basis of the Court's conclusions as to the potential supervisory liability of Sheriff Trevino and W. Wolfe, *see supra*, raises a fact issue as to whether Frio County had a policy or practice of ignoring inmate safety and whether this pattern was objectively deliberately indifferent to Escobar's safety. It is undisputed that Frio County promulgated a number of policies that would have governed the issues raised in this lawsuit—inmate rape and suicide—but that both W. Wolfe, as jail administrator, and Garza, as jailer, had never seen or been given these policies or been instructed on how to respond to a rape. (W. Wolfe Dep. [#60-3] at 88:24–89:4, 98:7–18, 104:8–20; Garza Dep. [#60-5] at 89:11–90:6,114:7–115:19.) Additionally, expert witness Robert Dumond's opinions on Frio County Jail's failure to follow its own policies remains uncontroverted by any contrary evidence. (Dumond Expert Report [#62-8] at 58.)

Again, the fact that Frio County disputes whether Escobar was actually assaulted or did actually cut himself on his arm is not for the Court to determine at this stage. The reality is that there is no documentation of these events aside from the observation logs indicating that Escobar reported them to various jail officials; the Court does not have objective evidence corroborating Escobar's or Frio County's rendition of the events. Accepting Escobar's facts, a reasonable factfinder could also conclude that at least one of the Frio County employees "had subjective

knowledge of a substantial risk of serious harm to [Escobar] but responded with deliberate indifference to that risk." *See Hare*, 74 F.3d at 650. The Court should therefore deny Frio County's request for summary judgment on Escobar's municipal liability claims.

## V. Conclusion and Recommendation

Having considered Defendants' motions, the response and reply thereto, the evidentiary record submitted to the Court, and the governing law, the undersigned recommends that Defendant Frio County and Sheriff Lionel Trevino's Motion for Summary Judgment [#60] and Defendant Frio County Jailers Wesley Wolfe, Escolastica Wolfe, Eulalio Garza, and Deputy Arocha's Motion for Summary Judgment [#61] be **GRANTED IN PART** as follows:

- Frio County Sheriff's Department should be awarded summary judgment on all claims asserted against it by Escobar because it lacks jural existence to be subject to liability separate and apart from Frio County.

- The remaining Defendants are entitled to summary judgment on Escobar's state-law claims of negligence and gross negligence because these claims are barred by the TTCA's election-of-remedies doctrine.

- The individual Defendants (Sheriff Trevino, W. Wolfe, E. Wolfe, Garza, and Deputy Arocha) are entitled to summary judgment on Escobar's Section 1983 claims based on their alleged failure to protect Escobar from sexual assault or self-harm because they are entitled to qualified immunity on these claims.

In all other respects, the motions should be **DENIED**. The individual Defendants—both the responding individuals (Garza, E. Wolfe, and Deputy Arocha) and their supervisors (Sheriff Trevino and W. Wolfe)—are not entitled to qualified immunity as to Escobar's Section 1983 claim based on a failure to provide adequate medical care in response to the alleged assault because a jury must first decide whether to credit Escobar's testimony that he was, in fact, sexually assaulted. Nor is Frio County entitled to summary judgment on Escobar's Section 1983 claim based on municipal liability. These claims should proceed to trial.

## VI.  Instructions for Service and Notice of Right to Object/Appeal.

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the clerk of the court, and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 18th day of July, 2019.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE